Moses LEROY, et al.,
Plaintiffs-Appellees,

v.

CITY OF HOUSTON, et al.,
Defendants-Appellants.

No. 86–2719.

United States Court of Appeals,
Fifth Circuit.

Nov. 12, 1987.

Rehearing and Rehearing En Banc
Denied Dec. 28, 1987.

John E. Fisher, Robert J. Collins, Houston, Tex., for City of Houston, et al.

Jessica Dunsay Silver, George Schneider, Attys., U.S. Dept. of Justice, Civ. Rights Div., Wm. Bradford Reynolds, Washington, D.C., for amicus curiae, U.S.

George Korbel, L.A. Greene, Jr., Craig A. Washington, Houston, Tex., Sidney J. Braquet, Jessie Bottello, San Antonio, Tex., for Moses Leroy, et al.

Before GOLDBERG and JONES *, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The district court awarded attorneys' fees and costs exceeding $1,000,000 to plaintiffs, who it found "prevailed" in three separate actions and administrative proceedings to enforce the Voting Rights Act, 42 U.S.C. § 1973*l et seq.* against the City of Houston. We disagree with significant portions of the district court's legal analysis, and consequently we REVERSE and REMAND.

## I.

The skirmish over attorneys' fees culminates a complex, protracted and in many ways unique battle between the protagonists in this litigation. In December, 1973, the plaintiffs-appellees, black and hispanic voters in Houston, Texas, filed suit alleging that their votes were unconstitutionally diluted by the at-large method of electing the Houston City Council. *Greater Houston Civic Council v. Mann*, No. H–73–1650 (S.D.Tex.) (*Mann*).

Two years later, before *Mann* had come to trial, the same attorneys, representing the same and similar plaintiffs, filed a second lawsuit. In that action, they sought to enjoin a city election in which voters from several newly annexed areas would be participating, because the annexations had not been submitted for preclearance through the Department of Justice under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c.[1] *Leroy v. City of Houston*, No. H–75–1731 (S.D.Tex., Oct. 1975) (*Leroy I*). By the time the complaint in *Leroy I* was served on the City, it had submitted the annexations to the U.S. Attorney General for review under section 5. A three-judge court denied the requested preliminary injunc-

tion, the annexations were subsequently precleared by the Attorney General, and *Leroy I* was dismissed in 1978. Attorneys' fees requested by the plaintiffs were denied by the three-judge court. *Leroy I* was dismissed with prejudice, costs being taxed against the Plaintiffs, and no appeal followed.

In 1976, *Mann* went to trial for five and one-half weeks. The following year the district court entered judgment for the defendants, holding that the at-large system did not dilute minority voting strength in Houston. Plaintiffs appealed, and in August, 1978, the Attorney General appeared as amicus curiae on plaintiffs' behalf, urging this Court to vacate the district court's decision.

The City continued to expand through annexations in 1977, but by November 1978, it had not submitted these additional accretions of territory for Justice Department review under section 5. A special bond election was set in the expanded city for January 1979. The plaintiffs, having been denied leave to amend their complaint in *Leroy I*, filed a new complaint seeking to enjoin the annexations and further elections pending preclearance. *Leroy v. City of Houston*, No. H–78–2174 (S.D.Tex., Nov. 1978) (*"Leroy II"*). The Attorney General sued the City for the same purpose, and the two cases were consolidated on December 15, 1978. The City assured the three-judge court that the annexations would be submitted and no elections would be held until preclearance was obtained. Accordingly, on December 28, 1978, the court denied motions filed by the Attorney General and the private plaintiffs for a preliminary injunction.

The City submitted both its 1977 and 1978 annexations for section 5 review by the Justice Department. The Department of Justice communicated with the individual plaintiffs and their attorneys who urged the Attorney General to object to the annexations in question. In June, 1979, the Attorney General did object to 14 of the annexations which he found diluted minority voting strength in the context of the city's at-large voting system. Neverthe-

---

* Due to his death on October 19, 1987, Judge Hill did not complete his participation in this decision. The case is therefore decided by a quorum. 28 U.S.C. § 46(d).

1. Plaintiffs asserted that the annexations affected changes in local voting procedures. Such changes must be submitted to and reviewed by the Justice Department to assure that they do not dilute minority voting rights. The plaintiffs believed that annexations of predominantly white neighborhoods would be adverse to their interests.

less, the Attorney General pre-cleared the holding of a referendum in the expanded city for the purpose of adopting a mixed single-member and at-large voting plan.[2] The voters approved the referendum, and in September, 1979, the Attorney General precleared the districting based on the new plan and withdrew his objection to the annexations.

The parties in *Mann* thereupon informed this Court that the appeal was moot. In December 1979, this Court remanded to the district court for consideration of attorneys' fees. The issue of attorneys' fees languished in the district court until late 1982. Following extensive proceedings, including an aborted attempt by the City to recuse the district judge and an eight-day trial, the district court awarded fees, as requested by the plaintiffs, for their pursuit of litigation in *Mann, Leroy I, Leroy II,* and the Attorney General's administrative Section 5 review process.

The City of Houston appeals both the legal basis and amount of the award, and the Justice Department appears as amicus curiae on the former issues.

## II.

■ The "prevailing party" in a Voting Rights Act lawsuit is entitled to recover his attorney's fees. 42 U.S.C. § 1973*l* (e).[3] If the plaintiff prevails because judgment is rendered in his favor, a successful claim for fees is a foregone conclusion. Questions arise, however, when essential victory is obtained by other means than judgment following trial. Nevertheless, "all of the circuit courts have consistently held ... that a plaintiff may also prevail for § 1988[4] purposes when the case terminates in his favor by settlement, or when the defendant voluntarily undertakes action that results in accomplishment of the plaintiff's goal even though it moots the case." *Hennigan v. Ouachita Parish School Board,* 749 F.2d 1148, 1151 (5th Cir.1985). In such a case, the plaintiff must identify the goal that he sought to achieve in bringing his action. When that goal has been achieved by the defendant's conduct apart from the compulsion of court order, the plaintiff must then establish that the lawsuit caused the defendant to act. *Hennigan* is instructive:

> To demonstrate this causal connection, the plaintiff must demonstrate that his suit was 'a substantial factor or a significant catalyst in motivating the defendants to end their unconstitutional behavior.' (citations omitted). This means more, however, than merely showing that the event occurred after suit was filed. Here, as elsewhere in the law, *propter hoc* must be distinguished from *post hoc.* The inquiry has been described as 'an intensely factual, pragmatic one,' (citations omitted) and courts should carefully consider the chronology of events in order to assess the provocative effect of the plaintiffs' lawsuit. (citations omitted).

*Hennigan,* 749 F.2d at 1152. *See also Garcia v. Guerra,* 744 F.2d 1159, 1162 (5th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 497, 53 U.S.L.W. 3776 (1985); *Williams v. Leatherbury,* 672 F.2d 549, 551 (5th Cir.1982); *Robinson v. Kimbrough,* 652 F.2d 458, 466 (5th Cir. 1981).

That plaintiffs eventually obtained the objective of their litigation is not seriously disputed. *Mann* sought to revise the election of city council members from an at-large system to that of single member districts. In 1979, the City instituted the mixed plan previously described. The City also agreed that in the course of future annexation activity, any necessary expansion of city council would continue to protect minority representation.[5] The substantial questions for prevailing party purposes are (1) whether plaintiffs' litigation was a significant catalyst to the defendants to revise city council districts, and (2) if so, the extent to which all three of plaintiffs' lawsuits plus the participation in Justice Department administrative proceedings are compensable.

---

**2.** The proposed revision included nine members elected from single-member districts and five elected at-large.

**3.** "In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

**4.** 42 U.S.C. § 1988, governing fees in civil rights cases, is phrased similarly and should be construed consistently with the Voting Rights Act fee provision. *Arriola v. Harville,* 781 F.2d 506, 511 (5th Cir.1986).

**5.** The City's suggestion that the mixed plan for city council governance did not achieve the plaintiffs' goals for litigation is niggling.

## A. *Catalytic Effect*

■ The district court found as a fact that the plaintiffs' litigation was a significant catalyst to the city's adoption of single-member districts. This finding is not clearly erroneous. Fed.R.Civ.P. 52(a). "[T]he court of appeals may not reverse, ... even though convinced that had it been sitting as the trier of fact it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

The City objects that the change to single member districts was motivated principally by the increasingly unfavorable reaction of the Department of Justice to its vigorous annexation policy. In particular, the City contends that the Justice Department, while agreeing to preclear annexations of majority-white areas in 1977, foreshadowed future resistance to that policy if it were unaccompanied by protection for minority rights by measures like single member districts. The City urges that the imperatives of expanding the municipal tax base via annexation, combined with the Justice Department reaction, more powerfully motivated the City than did the litigation. This charge must fail. First, it quarrels only with the district court's assessment of the facts, which we cannot lightly disturb. Second, it misperceives as the plaintiffs' burden the duty to prove that the litigation was the only causative factor in the defendants' conduct. This is not so. The "substantial factor" or "significant catalyst" test does not require such exclusivity. Other events may have contributed to the City's ultimate acquiescence in the mixed district plan, but the district court would still be justified in concluding, from the facts before it, that the plaintiffs' litigation was also a significant contributing factor.[6] In a way, the City's argument against causal connection boils down to the charge that plaintiffs jumped on the redistricting train too early, with *Mann*, and thereafter were submerged in the course of events. Compare *Posada v. Lamb County*, 716 F.2d 1066, 1071 (5th Cir.1983), where the district court found that the plaintiffs boarded the train as it left the station and therefore denied fees. The chronology of events is indeed significant, but we cannot find clear error in the district court's contrary portrayal of causation.

■ The City, reinforced by the Department of Justice as amicus, also objects to the district court's lengthy description of the litigation as a cause acting upon the Justice Department to force the city to redistrict. We agree that this focus is unwarranted. The court described and analyzed the Justice Department's conduct in June 1979, when it refused to preclear the 1977–78 annexations, without any evidence from the Department itself. The court found that plaintiffs' lobbying activities before the Department galvanized the Department's opposition to Houston's failure to convert to a single-member district system of election. The court's conclusions are founded on hearsay testimony and speculation regarding Justice Department resources, policies and procedure in this case. The Justice Department rightly complains that it is inconsistent with the spirit and purpose of administrative preclearance under section 5 of the Voting Rights Act to permit judicial inquiry into its functions. Administrative pre-clearance activities are excluded from direct judicial review because speedy, definitive oversight of local election procedures, required by the statute, could not be achieved by allowing judicial review. *Morris v. Gressette*, 432 U.S. 491, 505, 97 S.Ct. 2411, 2420, 53 L.Ed.2d 506 (1977). Moreover, the Department relies heavily on confidential information and internal memoranda at arriving at administrative pre-clearance decisions. As the Justice Department suggests, the district court's mode of analysis here could easily have led or could in the future influence the parties to seek documents or testimony from the Department in order to prove whether plaintiffs' litigation motivated the Department to a course it would not otherwise have taken. Compare *Posada v. Lamb County*, 716 F.2d at 1075, superseded in this respect by *Arriola v. Harville*, 781 F.2d at 510. Such inquiries cannot be furthered consistent with upholding the confidentiality and efficiency of the administrative process.

This error by the district court does not, however, undermine its general finding,

---

**6.** The City points out various alleged errors in the district court's statement of facts. We find that none of them, taken singly or together, bears so directly on the court's ultimate conclusion as to undermine its overall trustworthiness.

based upon the entire sequence of events, of a significant causal connection between plaintiffs' litigation and municipal redistricting. *Leroy II*, according to the district court, resulted in the City's promise to preclear its 1977–78 annexations with the Justice Department. *Mann*, although lost at trial by the plaintiffs, was widely expected to be reversed and remanded and would pose a continuing threat of judicial intervention in the City's districting. Plaintiffs had demonstrated the perseverance to litigate whenever this would focus public attention on the alleged deficiencies of at-large voting, and the City could anticipate further similar activity.

Approaching from another perspective the compensability of the plaintiffs' lobbying activities with the Department of Justice, the City questions whether *Leroy II*, brought solely to enforce Section 5 preclearance procedures, can be reimbursed when the plaintiffs' avowed goal is substantive revision of election laws.[7]

The City and the Justice Department protest such an award as incongruous because Section 5 litigation has the narrow objective of forcing the governing body to submit a proposed voting change to the Justice Department without considering the merits of the proposal. *Perkins v. Matthews*, 400 U.S. 379, 383–86, 91 S.Ct. 431, 434–35, 27 L.Ed.2d 476 (1971). They would urge us to reject as a matter of law any causal connection between a plaintiff's Section 5 action and subsequent redistricting. We find no incongruity. The rather unusual situation in this case arises because plaintiffs had already litigated the constitutionality of the City's districting in *Mann* at the time that additional annexations compelled them to file *Leroy II*. The issue of substantive district revision was pending in the courts, pretermitting further assertion of such a cause of action. *Leroy II*, however, sought and achieved the goal of requiring the City to submit major annexations for Justice Department approval. In this case, achieving the procedural goal of preclearance review was expected by the plaintiffs to yield a favorable result before the Justice Department. If the City's annexations were found by the Department of Justice

not to protect minority voting rights, then the status of the annexations, and any bond elections predicated thereon, would remain doubtful pending compliance with the Voting Rights Act. We have elsewhere noted that in awarding fees for a school board reapportionment lawsuit, "the district court properly ignored the route taken, ... and focused instead on the fact that the plaintiffs arrived at their sought-after destination." *Hennigan*, 749 F.2d at 1153. Here, too, we find a compelling causal relation between the *Leroy II* procedural action to force Justice Department review of the voting change caused by annexations and the substantive revision sought by the plaintiffs.

The plaintiffs were, in sum, the irresistible force pressing upon the City as immovable object.

## B. *Compensable "Litigation" Activity*

The remaining issue with respect to plaintiffs' prevailing party status centers around whether their three lawsuits and activities before the Justice Department are fully compensable as "part and parcel of the litigation to enforce the Voting Rights Act." The district court breezed to this conclusion in the face of formidable procedural and legal obstacles.[8] The City acknowledges that if *Mann* significantly contributed to a redistricting decision, that litigation is compensable. *Leroy II* likewise falls within § 1973*l*(e). The district court's conclusions regarding *Leroy I* and the Department of Justice lobbying activities, for separate reasons, are infirm.

■ On a procedural basis, the district court erred in concluding that the time expended on *Leroy I* was compensable. The issue of attorneys' fees had previously been resolved against the plaintiffs in that case by a three-judge panel whose ruling was not appealed. *Leroy I* was dismissed with prejudice, no injunction against preclearance was entered, and costs were taxed against the plaintiffs. We espy no warrant in the Voting Rights Act to award attorneys' fees for litigation already concluded in which recovery of fees was refused. The "part and parcel" determination by the district court overlooked the

7. The district court did not discuss whether plaintiffs could be prevailing parties in *Leroy II* simply because that case resulted in the City's submission of annexations to the Department of Justice. It is unnecessary for us to reach this possible contention.

8. According to plaintiffs' fee application, they spent approximately 2,450 hours in connection with *Mann;* 140 hours on *Leroy I;* 496 hours on *Leroy II;* and 114 hours before the Department of Justice.

prior, controlling decision in *Leroy I* against an award of fees. The parties were bound by this result, *Southern Pacific Railroad Co. v. U.S.*, 168 U.S. 1, 48–9, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897), and the district court could not reverse it.

■ Second, in holding compensable the plaintiffs' activities before the Department of Justice, the district court recognized, but purported to distinguish, *Webb v. Board of Education of Dyer County*, 471 U.S. 234, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985) and *Arriola*, 781 F.2d 506. We find that these cases expressly prohibit an award of legal fees for plaintiffs' attorneys' lobbying activity before the Justice Department and consequently reverse this portion of the award. In *Webb*, the Supreme Court determined that attorneys' fees could not be awarded under 42 U.S.C. § 1988, the counterpart of the instant fee-shifting statute, for a state administrative process completed before litigation under the Civil Rights Act. The court said,

> Congress only authorized the district courts to allow the prevailing party a reasonable attorneys fee in an "action or proceeding to enforce [§ 1983]." Administrative proceedings established to enforce tenure rights created by state law simply are not any part of the proceedings to enforce § 1983 .... The time that is compensable under § 1988 is that "reasonably expended *on the litigation*." (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939 [76 L.Ed.2d 40] (1983).

*Webb*, 471 U.S. at 241–42, 105 S.Ct. 1928. The district court correctly observes that *Webb* did not appear to prohibit the recovery of attorney's fees for administrative proceedings for "work that was both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached before settlement." *Webb*, 471 U.S. at 243, 105 S.Ct. at 1929. However, the Supreme Court also noted, in the course of distinguishing between work performed "on the litigation" and work that advanced the administrative process alone, that the five years of work by plaintiff's counsel in the administrative proceeding was easily separated from the two years of work invested in subsequent litigation. We interpret *Webb* to require that counsel's participation in administrative activities be tied both qualitatively and timely to the lawsuit in order to establish that such work was performed "on the litigation". Contrary to the district court's conclusion, *Webb*'s standard was not met in this case.

First, from the standpoint of timeliness, the work counsel performed in the litigation and administrative proceedings here is as easily separable as in *Webb*. The plaintiffs' alleged constitutional entitlement to single-member districts had been tried in *Mann* in 1976, with judgment entered in 1977. *Leroy II* concluded in December, 1978. Only in 1979 did plaintiffs' counsel lobby before the Justice Department to promote the need for single-member districts. *Webb*'s standard of timeliness was previously applied by our court to the preclearance procedure under the Voting Rights Act in *Arriola*, 781 F.2d at 511, and is controlling in this case. *Arriola* held that time spent by plaintiffs' counsel, after injunction litigation had been completed successfully under the Voting Rights Act, for the purpose of influencing the Justice Department's pre-clearance review is not part of the litigation for purposes of attorneys' fee awards.[9]

With regard to the qualitative relation between work in administrative proceedings and work performed on the litigation, *Webb* likewise precludes plaintiffs' recovery of fees. Although the district court quoted *Webb*'s operative language, it failed to state how the Justice Department efforts were "both useful and of a type ordinarily necessary to advance the civil rights litigation." *Webb*, 471 U.S. at 243, 105 S.Ct. at 1929. *Webb*'s facts narrowly limit the scope of administrative work for which legal fees are recoverable. There, the plaintiff's counsel participated in trial-type proceedings involving precisely the issues and evidence later pertinent to plaintiff's § 1983 lawsuit. The Court nevertheless rejected any per se rule permitting recovery. As *Arriola* noted, pertinent to this case, the nature of the trial and administrative preclearance proceedings under the Voting Rights Act is essentially differ-

---

**9.** *Arriola* rejected the contention that *Webb* could be distinguished based on whether plaintiff's counsel appeared in administrative proceedings before or after the lawsuit. That rejection governs our panel.

ent.[10] Moreover, the district court's bare finding that "the work done before the Justice Department was a direct catalyst of change necessary to the resolution of the lawsuits," is insufficient to satisfy *Webb* and *Arriola*. Formulating the qualitative relationship in terms of causal connection confuses two distinct issues. Causal connection between counsel's efforts in litigation and the goal achieved by plaintiffs is essential to prevailing party status, as previously discussed. Whether the counsel's efforts were expended "on the litigation", however, as § 1973*l* (e), *Hensley, Webb*, and *Arriola* necessitate, identifies what services are compensable once plaintiff has shown that he prevailed. The "catalytic effect" perceived by the district court does not demonstrate that the services rendered before the Justice Department bore directly on the issues in *Mann* or were legally required or necessary to resolve *Mann*, which was then fully briefed on appeal. Similarly, *Leroy II* had concluded before preclearance review occurred. Thus, although we endorse *Arriola*'s observation that prevailing party counsel might in some cases recover "compensation for services rendered in a preclearance submission that bear directly on the issues in an independent lawsuit and where the work is required and necessary to resolve the issues of the independent lawsuit," *Arriola*, 781 F.2d at 507, n. 1, we perceive no basis to distinguish the denial of fee recovery in *Arriola* from this case.

To summarize the preceding discussion, plaintiffs are entitled to attorneys fees for their efforts in the *Mann* and *Leroy II* litigation. We reverse the district court's award of fees for *Leroy I* and counsel's efforts in the Justice Department preclearance proceeding.

### III.

After considering the factors enumerated in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974), the district court awarded approximately $850,000 in attorneys' fees for 4,659.95 hours of recorded services. After applying a contingency multiplier of 1.15 (1.20 for Green) and approximately $40,000 in expenses, the total award exceeds $1,000,000. The City challenges the total as excessive.[11]

Two recent Supreme Court decisions support challenges made by the City. In *Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, — U.S. —, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), a four-man plurality held that "in the absence of further legislative guidance, we conclude that multipliers or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss is impermissible under the usual fee-shifting statutes." *Delaware Valley*, — U.S. at —, 107 S.Ct. at 3087. Justice O'Connor separately concurred with an additional portion of the opinion, resulting in a majority view, that even if the Clean Air Act's fee shifting provision, and by analogy that of § 1988 and similar statutes, should permit such an adjustment for risk, it should be awarded under strictly controlled circumstances. *Delaware Valley*, — U.S. at —, 107 S.Ct. at 3089.[12]

For several reasons, the contingency factor awarded by the district court in this case does not pass muster under this newest episode of the *Delaware Valley* litigation. First, the court majority's fear of "severe difficulties and possible inequities" involved in making contingency awards requires that they be reserved for "exceptional cases." *Delaware Valley*, —

---

**10.** "[T]he preclearance process is separate from the lawsuit. The participants are not the same. The preclearance process is in a different forum. It follows different law. In fact ... it is not a judicial proceeding at all." *Arriola*, 781 F.2d at 511.

**11.** Having found certain aspects of the legal services non-compensable as a matter of law, we apply the following discussion to the remaining services covered by the award. We also note that the *Johnson* factors must now be considered in the following framework: (1) ascertain the nature and extent of the services supplied by the attorney; (2) value the services according to the customary fee and quality of

the legal work; and (3) adjust the compensation on the basis of the other *Johnson* factors that may be of significance in the particular case. *Curtis v. Bill Hanna Ford, Inc.*, 822 F.2d 549, 552 (5th Cir.1987), citing *Nisby v. Comm'n Court of Jefferson County*, 798 F.2d 134, 136 (5th Cir. 1986), clarified by *Cobb v. Miller*, 818 F.2d 1227 (5th Cir.1987).

**12.** The plurality admonished, "an attorneys fee award should be only as large as necessary to attract competent counsel." *Lewis v. Coughlin*, 801 F.2d 570, 576 (2d Cir.1986), cited in *Delaware Valley*, — U.S. at —, 107 S.Ct. 3089, n. 12.

U.S. at ——, 107 S.Ct. at 3088, concurring opinion, 107 S.Ct. at 3090. Second, the need and justification for a contingency award must be readily apparent and supported by evidence in the record and specific findings by the court. *Delaware Valley,* —— U.S. at ——, 107 S.Ct. at 3088. Contrary to *Delaware Valley,* the district court did not find that this litigation, although filed in a complex area of law, was "exceptional." We do not perceive it as such. There is also none of the required evidence that without risk-enhancement the plaintiffs in this case would have been unable to find counsel in the local market. Although the court observed at one point that two public interest firms were uninterested in this litigation, the final fee award runs to a consortium of ten individual attorneys plus Hogan & Hartson, indicating a breadth of available talent. Moreover, the trial court erroneously justified the contingency factor in part upon findings that the Supreme Court majority says are not pertinent to evaluation of this issue, e.g., that plaintiff's position is unpopular in the community, and that the defendant was difficult and obstreperous. *Delaware Valley,* 107 S.Ct. at 3089. Finally, the district court relied upon the holding of the Eighth Circuit in *Craik v. Minnesota State University Board,* 738 F.2d 348, 350–51 (8th Cir.1984) that contingency adjustments must be made to attract lawyers to civil rights cases, a holding expressly rejected by the Supreme Court majority in *Delaware Valley.* 107 S.Ct. 3082, n. 4; Justice O'Connor's concurrence, 107 S.Ct. at 3090. In sum, the district court's award of a contingency adjustment to the lodestar, particularly in view of its generous treatment of the lodestar issues themselves, cannot survive the constraints imposed by *Delaware Valley.*

■ The second recent controlling development is the Court's determination that expert witness fees in excess of standard per diem and mileage costs may not be allowed as part of the costs to prevailing parties under federal fee-shifting statutes unless the statute explicitly so provides. *Crawford Fitting Co. v. J.T. Gibbons, Inc.,*

—— U.S. ——, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). Although that case expressly considered whether Fed.R.Civ.Proc. 54(d) could, in an antitrust case, override the statutory limit on witness fees, the Court's general reasoning leaves us no room to construe the Voting Rights Act provision here otherwise. *But see* Blackmun, J., concurring, —— U.S. ——, 107 S.Ct. 2499. The Voting Rights Act does not specifically allow recovery of expert witness fees, and we must reverse this portion of the district court's award.[13]

■ The district court's findings of fact supporting its award are reviewed under the clearly erroneous standard, but the ultimate award of attorneys' fees is reviewed for abuse of discretion. *Cobb v. Miller,* 818 F.2d 1227, 1231 (5th Cir.1987); *Brantley v. Surles,* 804 F.2d 321, 327 (5th Cir. 1986). As noted in *Schwarz v. Folloder,* 767 F.2d 125 (5th Cir.1985), however, "[d]iscretionary choices are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *Schwarz,* 767 F.2d at 127 (citations omitted). After extensively reviewing the record, we are disturbed that the district court uncritically skewed the lodestar factors in every instance favorably to the plaintiffs and against the City.

■ In setting the hourly rate applicable to each of the plaintiffs' attorneys, the district court used rates prevailing in 1985, even though virtually all of the work was performed in the period 1976–79. While current rates may be used to compensate for inflation and delays in payment, *see Delaware Valley,* 107 S.Ct. 3081, *Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1096 n. 26 (5th Cir.1982), the district court based its figures on current rates *and current levels of expertise.* Thus, the plaintiffs' attorneys received a double boon: they received compensation based on current rates for work done, for the most part, in the late 1970's, and they were permitted to base their current rates on experience and expertise gained since that time.[14] From our review of the record in

---

**13.** Plaintiffs contend that the compensability of expert witness fees was not raised previously by the City. We read the City's brief, together with its reference to the trial court opinion, squarely to present this issue.

**14.** For example, the district court justified its rate of $200 per hour for L.A. Greene based in part on his board certificated status and on the fact that he has lectured, taught, and published. However, Mr. Greene's resume [PX 14a] indi-

this case, we are convinced that this practice produced a windfall of the sort disdained by Congress and the Supreme Court. *See City of Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 2697, 91 L.Ed.2d 466 (1986); *Hensley,* 461 U.S. at 430 n. 4, 103 S.Ct. at 1938 n. 4.

The district court awarded fees at the high end of the spectrum of current local commercial practice rather than at rates customarily charged by attorneys in civil rights cases or customarily charged by these counsel in private practice. The City does not contend, and we therefore do not decide, whether the prevailing rate must be gauged by reference to the actual rates charged by plaintiff's counsel, if they can be calculated, instead of by market data. *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 13–18 (D.C.Cir.1984). Insofar as the City suggests that the hourly rates awarded are clearly erroneous under the standard used by the district court, we cannot so find. Nevertheless, the court took a generous view of the appropriate hourly rates and does not seem to have considered as particularly probative these lawyers' actual charges for comparable services. For instance, Mr. Korbel billed only $125/hour to the City of San Antonio in 1978, but the court awarded his fee at $200/hour.

■ Miscellaneous determinations by the district court further color our review of its exercise of discretion. The court focused on such inappropriate matters as the lack of funds available to plaintiffs' counsel and that a black person oversaw some appellate briefing for the City to undergird its determination of fees. Moreover, in the context of discussing the difficulty prong of *Johnson,* the court castigated the City and its attorneys for various misdeeds committed during the litigation,

such as the method of the City's submission of plans to the Justice Department, the City's request that certain meetings with the Justice Department be closed, the City's attempt to have the district judge recused from the case, and the City's alleged reneging on a settlement on attorneys' fees. We disagree with the district court's finding that "the plaintiffs' attorneys are entitled to be paid for being subjected to this conduct." An award of attorneys' fees is to be used as an incentive for the private enforcement of constitutional rights, and not as a shill for the imposition of punitive damages. *Ursic v. Bethlehem Mines,* 719 F.2d 670, 677 (3rd Cir.1983). The determination of hours spent by counsel adequately reflects the work they did in responding to the City's strategy. Compare *Delaware Valley,* —— U.S. ——, 107 S.Ct. at 3089. No punitive compensation was required.

■ We are also troubled by the court's wholesale acceptance of plaintiffs' time records. In assessing time spent by plaintiffs' counsel for lodestar purposes, the court repeatedly acknowledged deficiencies in the billing records in this case, noting that some were reconstructed, after-the-fact summaries, some were often "scanty," some were never kept at all, and many lacked explanatory detail. Nevertheless, the district court accepted *in toto* the number of hours evidenced by the records on such grounds as Mr. Botello's law school training in recordkeeping, the purported exercise of billing judgment,[15] and that this court has required contemporaneous records only since 1983. *But see Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1094 (5th Cir.1982). None of these asserted grounds explain why such faulty records should be accepted with no reduction of the hours of the lodestar. Indeed,

cates that he was not board certified in Civil Trial Law until two years after the *Mann* trial, while the bulk of his submitted hours were spent, and all of his lectures, publications, and teaching positions, date after 1980.

Even more troubling is the $150 per hour rate awarded Jesse Botello. The majority of Botello's hours were spent on the trial of the *Mann* case in 1977–78. As Mr. Botello was licensed to practice in 1976, the effect of the district court's decision was to award $150 per hour for work done by a second- or third-year attorney. While we recognize Mr. Botello's particular expertise in Voting Rights Act law, such an hourly rate is unreasonable.

**15.** Despite making repeated findings that the attorneys exercised billing judgment in this case, the billing records are completely devoid of any hours written off. *See National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1327–28 (D.C.Cir.1982) (billing records should reflect whatever time was spent on the case but not included in the fee request). In fact, the sole example of billing judgment shown on the face of the record involved Mr. Korbel, who originally eliminated 196 hours from his request as an exercise in billing judgment, only to reinstate that time request later.

*Hensley* counsels the opposite. *See Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939 ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly"). Perhaps the best examples of the district court's rationale for its decision were its findings that "the City has [not] demonstrated that ... the hours were unreasonable" and that it "heard no serious, specific objection to the reasonableness" of the hours claimed. Such logic is misplaced: the burden of proof of reasonableness of the number of hours is on the fee applicant, *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941, and not on the opposing party to prove their unreasonableness.

After careful review of the record, this court holds that to award $1 million in attorneys' fees and expenses was excessive and an abuse of discretion. While it is a rare case indeed in which we find an abuse of discretion regarding an award of attorneys' fees, we cannot shirk our responsibility under the law when we encounter one. *See Cobb v. Miller*, 818 F.2d at 1227 (reversing and rendering on the amount of attorneys' fees). We have laboriously reviewed the record in light of the district court's opinion, the parties' contentions, and the considerations outlined in this opinion. We believe a fair, indeed ample award of $693,805[16] remunerates the ultimately successful efforts of plaintiffs' counsel and fulfills the goal of the Voting Rights Act. The excess amount awarded by the district court was founded on erroneous legal analysis and in part upon an abuse of its discretion. We therefore vacate the judgment of the district court, and remand for entry of a judgment in the amount of $693,-805.00.

The judgment of the district court is REVERSED and the case is REMANDED for entry of judgment consistent herewith.

REVERSED and REMANDED.

---

**16.** We reach this result as follows. The district court awarded appellees approximately $843,-337.50 for 4,659.95 hours' work, before adding any contingency multiplier. This represents an average hourly rate of $181. We deduct 254 hours from the base number of hours, reflecting the work on *Leroy I* and the Justice Department proceedings that we have held non-compensable. We further deduct 13% from the average hourly rate for incomplete time records. The resulting award is $693,805.00.