**BINGHAM et al. v. WHITE, Collector of Internal Revenue.**

District Court, D. Massachusetts. March 22, 1929.

No. 2815.

Norman W. Bingham, Jr., Blodgett, Jones, Burnham & Bingham, George S. Fuller, and Frederick H. Chase, all of Boston, Mass., for plaintiffs.

Frederick H. Tarr, U. S. Atty., and J. Duke Smith, Sp. Asst. U. S. Atty., both of Boston, Mass., for defendant.

BREWSTER, District Judge. This case was tried to a jury, and a directed verdict for the plaintiffs having been set aside by the Circuit Court of Appeals (25 F.(2d) 837), and jury trial having been waived by the parties, the case is again before the court on its merits. It is submitted upon an agreed statement of facts, supplemented by testimony and exhibits.

The suit is brought to recover $37,583.20, being an additional assessment of the estate tax upon the estate of King Upton, who died testate on February 27, 1921.

The additional assessment is due to the fact that the Commissioner of Internal Revenue included in the gross estate of the decedent the value of certain shares of stock which, according to the allegations of the plaintiffs, were the subject-matter of a valid and completed gift inter vivos to his wife, Annie D. Upton. The Commissioner of In-ternal Revenue also included in the decedent's estate the value of other shares of stock given during his lifetime by the decedent to his daughter-in-law. At the trial the defendant conceded that the shares given to the daughter-in-law were erroneously included, and stood ready to confess judgment for $4,050.40, the amount of the additional tax assessed as a result of including these shares. I am advised that since the trial the government has paid the plaintiffs this amount, with accrued interest thereon. The amount now involved, therefore, is $33,532.80.

It is conceded by the defendant that, if the value of the shares transferred to Mrs. Annie D. Upton is to be included in the decedent's gross estate, it is because the shares fall within subdivision (a) of section 402 of the Revenue Act of 1918 (40 Stat. 1097), which reads as follows:

"Sec. 402. That the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible, or intangible, wherever situated—

\* \* \* \* \* \* \* \* \* \* \*

"(a) To the extent of the interest therein of the decedent at the time of his death which after his death is subject to the payment of the charges against his estate and the expenses of its administration and is subject to distribution as part of his estate."

The single question presented is whether Mr. Upton during his lifetime consummated a valid and completed gift to his wife of the shares in controversy. The answer to this question has to come from facts not seriously in dispute. They may be summarized as follows:

King Upton, the decedent, was in 1918 a holder of a considerable amount of common stock in the American Glue Company and in the National Glue Company. These companies, during 1917 and 1918, especially the American Glue Company, paid large dividends, materially increasing the decedent's surtax. Mrs. Upton had then, in her own right, property valued at around $50,000, which included stock of the American Glue Company. Her brother had become financially involved, and had transferred to her all of his assets, in consideration for her agreement to support him during his life. The decedent had advanced, prior to November, 1918, on account of these expenses, something like $4,000. In November, 1918, in order to pay certain indebtedness of the brother, Mrs. Upton borrowed from

a savings bank $20,000 upon collateral which she furnished. The cost of his (the brother's) support since then has been from $3,000 to $5,000 per annum.

King Upton had been interested in another company, which had failed, leaving a very substantial indebtedness to be paid by Mr. Upton, who had indorsed the company's notes. This liability he had worked out over a period of 12 or 15 years, finally paying everything in full. In working off this obligation, and in accumulating stock of the American Glue Company, he was at all times a heavy borrower at the banks. During the year 1918 the decedent talked over with his wife and his son, and also with his brother, Mr. Roger Upton, the advisability of turning over to his wife a sufficient number of shares, so that her income would be substantially equal to his, and with that end in view he sought the advice of his counsel, expressly stating in effect that he desired to do whatever was necessary in order to make a valid, bona fide gift to his wife. In one letter to his counsel he expressly disclaims any intention of taking back from Mrs. Upton any of the stock which he was to give her. He also inquired whether there was any legal objection to Mrs. Upton giving him a part of the income she might receive to pay certain expenses, such as yacht or household expenses. He was advised by his counsel that whatever transfer was made should be an absolute transfer and without any strings attached. There was also talk about the legality and feasibility of transferring to the wife shares of stock hypothecated with banks to secure decedent's notes. His counsel worked out a plan by which this could be done.

During October, November, and December, 1918, and January, 1919, the decedent caused to be transferred to his wife on the books of the corporations 1,962 shares of the common stock and 200 shares of the preferred stock of the American Glue Company and 1,286 common shares of the National Glue Company.

At the time of the transfers, a little over one-half of the shares transferred were under pledge to banks to secure decedent's obligations. The transfer agents redelivered certain of the new certificates to the banks on written directions signed by Mrs. Upton. Certificates representing the remaining shares were delivered to a Mr. Crowell, who held a power of attorney from Mrs. Upton, and who, in respect to her financial affairs,

acted as her agent. Mr. Crowell placed these shares in Mr. Upton's safe deposit box at the State Street Trust Company. To this box Crowell had access, but Mrs. Upton had not. Although Mrs. Upton had a safe deposit box in Salem, she took therefrom all of her securities, and handed them to Mr. Crowell, and told him to look after them, and these were placed in Mr. Upton's box in the State Street Trust Company. Mr. Crowell was Mr. Upton's secretary, and received his salary from him. Without additional compensation, he looked after business matters for Mrs. Upton, who was not familiar with such transactions, and whose interests presumably lay in other directions.

At the time of Mr. Upton's death, there were standing in Mrs. Upton's name 2,400 shares. She had also previously received a stock dividend of 3,300 shares, which she had turned over to her husband, in order that he might borrow necessary funds to enable him to participate, on behalf of himself and his family, in contemplated refinancing of the American Glue Company. Mr. Upton died before these plans were effectuated. It is contended that these 3,300 shares, as well as the 2,400, belonged to Mrs. Upton, and did not constitute a part of the decedent's estate.

Early in October, 1918, an account was opened in the Webster & Atlas National Bank in the name of Annie D. Upton. In this account there had been deposited, up to the time of Mr. Upton's death, dividends declared on the stock transferred amounting to $86,456, dividends from other stocks belonging to Mrs. Upton amounting to $6,330, the proceeds of the $20,000 note, coupons, $886.15, payments by Mr. Upton amounting to $9,000, and miscellaneous items, other than interest on the bank account, of $10,899. None of the dividends on the American Glue stock, which Mrs. Upton had owned prior to the transfer in question, were deposited in this account. Checks used in connection with this account had "Annie D. Upton" printed above the space for signature, and the word "Attorney" below the space. They were for the most part signed by Mr. Crowell, but some were signed by Mr. Upton, each of whom had on file with the bank a power of attorney from Mrs. Upton. The power to Mr. Crowell was merely to sign checks. The power to Mr. Upton was broader, and included the power to sign and indorse stock certificates and to negotiate the purchase and sale thereof. The money

checked out of this account was used as follows:

Payments to Mrs. Upton or for her personal expenses, or for household or auto expenses ................................. $22,935 85
Payments to or for Walter Q. Dane, or for principal or interest of Mrs. Upton's $20,000 note, the proceeds of which had been used to take care of Walter Dane's indebtedness. to two brokers' houses and to Mr. Upton................. 31,186 68
Payments to King Upton or for yacht expenses ..................................... 18,899 36
Payments on account of principal or interest on notes of Mr. Upton, secured entirely by stock in the name of Annie D. Upton ...................................... 13,625 15
Payments on account of such notes, secured in part by stock in Mrs. Upton's name ....................................... 30,375 82
Payments on account of such notes, having no stock in name of Mrs. Upton as collateral ................................... 14,693 43
Miscellaneous payments ..................... 2,599 66

The power of attorney to Mr. Upton, referred to above, was dated September 21, 1918, and it appears that Mr. Crowell had been advised, by the attorney who was looking after the legal details of the transfer of the hypothecated shares, that it might be necessary in some cases to use a power of attorney from Mrs. Upton to indorse the stock before the banks would let the shares go out of their hands temporarily for transfer. The power of attorney appears to have been drawn in the office of Mr. Crowell's attorney, and was deposited at the Webster & Atlas National Bank, and remained there until obtained for the purposes of the trial. There was no evidence that the power of attorney was ever used by King Upton, except as authority to draw checks. He had never exercised the power in the transferring of shares. Mrs. Upton had given a similar power of attorney to her son on the occasion of her going abroad in 1920, and since Mr. Upton's death the son has acted under a similarly broad power of attorney, dated March 15, 1921. No certificates representing the shares in question were ever indorsed by any one other than Mrs. Upton. In May, 1920, the stock dividend of 150 per cent. was declared, and a certificate for 3,300 shares was issued to Mrs. Upton and delivered to Crowell, who, a few days before Mr. Upton's death, handed it to Mr. Upton, who took it to Mrs. Upton and had her indorse it over to him. It was then split up into 100-share certificates, all issued in his name, 32 of which were still in his box at the time of his death, one having been pledged by him.

After the decedent's death, the executors filed in the probate court for Essex county a petition for instructions respecting the claim of Mrs. Upton to these shares as her own property. After due hearings, the court decreed that the 3,300 shares were the property of Annie D. Upton, and that it was the duty of the executors to transfer the shares to her "free and discharged of any claims against said shares as a part of the assets of the estate of said King Upton."

King Upton made his will in 1915, by the terms of which his estate passed to trustees, to hold for the benefit of the testator's wife. She was to receive during her lifetime the income only.

On this state of facts, the defendant contends that the shares of stock transferred by the decedent to his wife were, at the time of his death, property subject to the payment of decedent's debts, and subject to distribution as a part of his estate. In support of this contention the defendant argues that the plaintiffs have not shown that the decedent, in transferring the shares to his wife, intended them as a gift to her.

There was evidence offered for the purpose of showing that the decedent, in making the gift, aimed to provide his wife with an independent source of income. I cannot attach controlling importance to this testimony, in view of the fact that the financial fortunes of the decedent were largely dependent upon the success of the American Glue Company. If misfortune should overtake that company, so as to seriously impair its dividend-earning capacity, the income of Mrs. Upton will be cut off. Of course, if Mr. Upton was likely to embark upon outside speculative ventures, then the provisions that he undertook to make for Mrs. Upton might have been entirely inadequate. There was no evidence that any such plan was contemplated. While very likely Mr. Upton was not unaware of the benefits that would accrue to Mrs. Upton from the outright ownership of the transferred shares, I have no doubt that the dominating motive which actuated the decedent in making the alleged gift was to split up the income derived from the shares, in order to reduce his tax liability. But there is a wide distinction between motive and intent.

 If the decedent intended a completed gift and carried his intention into effect, it is immaterial what his reasons were for making the gift. Wehe v. McLaughlin (C. C. A.) 30 F.(2d) 217, 218. We are not dealing here with a case of evasion of lawful taxes. The decedent's right to make a gift to his wife cannot be questioned. The law encourages rather than discourages such gifts. If a

gift was consummated, the taxpayers returned and paid the required tax upon the divided income. There was no fraud practiced upon the government. It has frequently been said that, in the absence of evidence of fraud, a gift, otherwise valid, will not be invalidated solely on the ground that the gift resulted in the reduction of the donor's tax liability. Bing v. Bowers (D. C.) 22 F.(2d) 450; United States v. Isham, 17 Wall. 496, 21 L. Ed. 728; Vaughan v. Riordan (D. C.) 280 F. 742; Appeal of Spencer Borden, Jr., Ex'r, 6 B. T. A. 255. See, also, Stein, Ex'r, v. Commissioner of Internal Revenue, 9 B. T. A. 486, 490.

The Massachusetts courts recognize a rebuttal presumption that property transferred by a husband to his wife is intended as a gift, advancement or settlement for her benefit. Edgerly v. Edgerly, 112 Mass. 175; Powell v. Powell, 260 Mass. 505, 157 N. E. 639.

There is much evidence in the case at bar which tends to support rather than rebut the presumption. The decedent had expressed to his son and to his brother on different occasions his intention to give his wife sufficient of his holdings in the glue companies, so that her income would be substantially equal to his. He had discussed the matter with his wife, and, in unmistakable terms, had revealed to his lawyer his desire that his wife should receive a bona fide gift. In its bearing upon his intention I give some weight to the decedent's motive to reduce his tax obligations. He must have known, in the light of the advice he had received, that in order to effectually accomplish his end it would be necessary to complete the gift in his wife. His motive, therefore, strengthens rather than weakens the plaintiffs' claim that he intended to make a valid gift.

I find, therefore, that, when the decedent transferred the shares to his wife, he intended to do whatever was necessary to complete the gift in her, and that he then expected and believed that he had made such a gift.

It remains to be determined whether, upon the facts shown, the decedent accomplished his purpose. The defendant claims that he did not, because (a) there was no sufficient delivery; and because (b) there was no surrender of dominion and control over the shares in question.

Because of the peculiar nature of corporate shares, it has generally been held that the transfer of the certificate, followed by a transfer on the books of the corporation and the issuance of a new certificate in the name of the transferee, was sufficient to invest the latter with full title to the shares transferred. Tucker v. Curtin (C. C. A.) 148 F. 929, 934; Colton v. Williams, 65 Ill. App. 466; Barnhouse v. Dewey, 83 Kan. 12, 109 P. 1081, 29 L. R. A. (N. S.) 166; Stewart v. Collins, 36 Wyo. 210, 254 P. 137.

When shares have been transferred by a husband to his wife, the fact that the new certificates were placed in the safe deposit box of the husband has not been deemed sufficient to defeat the rights of the wife to the shares. Tileston v. Tileston, 234 Mass. 530, 125 N. E. 555; Thomas v. Thomas, 70 Colo. 29, 197 P. 243; Roberts' Appeal, 85 Pa. 84; Jones v. Jones (Mo. App.) 201 S. W. 557. See, also, Regan v. Howe, 121 Mass. 424, 426.

Applying these rules to the facts of the present case, the certificates representing the shares were indorsed over by the decedent; the transfers were recorded on the books of the respective corporations, and new certificates issued in Mrs. Upton's name. About half of the shares were held as collateral by banks. The interest of the donor in these shares would be subject to the rights of the pledgees, and his gift must have been, therefore, subject to these outstanding rights. Respecting these shares, the new certificates in Mrs. Upton's name were substituted for the old certificates surrendered for cancellation. As to these, it must be held that the donor did all that he could have done to make a complete delivery of the shares.

Respecting the other shares, they were delivered to Mr. Crowell, acting as agent for Mrs. Upton, and were placed in a safe deposit box in the State Street Trust Company, to which he at all times had access. Neither the fact that Crowell was also agent for the decedent, nor the fact that the decedent had access to the box, can be regarded as material on the question of delivery.

I accordingly find that there was a sufficient delivery to effectually pass the legal title to the corporate shares to Mrs. Upton.

But it is argued by the defendant, that, if the bare legal title vested in the wife, nevertheless the decedent retained such control and dominion over the shares that, in contemplation of law, they must still be regarded as a part of his estate at the time of his death. This argument is based largely upon the power of attorney which Mrs. Upton gave to her husband, prior to the transfers, and upon the manner in which the income was disposed. I do not find that this contention can be upheld. In the first place, it

imparts to a power of attorney a legal significance which is not warranted, and it overlooks certain fundamental principles pertaining to such powers. The grantor of a power of attorney designates the grantee as his agent, and confers upon the latter revocable authority to act for and in the stead of the grantor. Such powers never can be lawfully exercised for the personal benefit of the grantee of the power. English v. English, 229 Mass. 11, 13, 118 N. E. 178. By giving the power of attorney to indorse the stock, Mrs. Upton conveyed no rights in the shares which she had acquired from her husband. Not until the power was exercised would she be divested of any interest in the shares, and this power, by the express terms of the instrument, could only be exercised in the sale of the shares and lawfully could be exercised only for her benefit.

It is a significant fact that the decedent never exercised his power to indorse any of Mrs. Upton's certificates. Whenever there was an occasion for the indorsement, the certificates were in every instance presented to Mrs. Upton for her signature.

I agree with plaintiffs in their claim that the power of attorney which Mrs. Upton gave her husband "to sign or indorse stock certificates and negotiate purchase and sale thereof" was not enough to warrant the court in finding that the decedent had not parted with full dominion and control over the shares. Mrs. Upton could have revoked the power of attorney at any time, and, until she did, whatever dominion or control the decedent had over them he had as her agent or attorney in fact, and not by virtue of any rights which he had retained or acquired in the shares.

 I do not think that any different conclusion can be reached, if we consider also the way in which the dividends on the stock were treated. They were paid by check to Mrs. Upton, delivered to her agent, and deposited in her account in the Webster & Atlas National Bank. Up to this point the procedure is wholly consistent with absolute ownership in Mrs. Upton.

It is true that no checks were drawn against this account in the Webster & Atlas National Bank, except by those holding powers of attorney to act for her, and that a substantial portion of the income was used for the payment of household expenses and the expenses of maintaining a yacht, or was otherwise applied for the benefit of the decedent. It is not shown that this distribution was pursuant to any agreement on the part of Mrs. Upton, made either before or after the shares were transferred, nor is there any indication that it was done in the execution of any trust which Mrs. Upton had assumed. On the contrary, the decedent's attorney instructed him that "stock when transferred to her [Mrs. Upton] should not be impressed with any trust or actual obligation of any kind in your [Mr. Upton's] favor," and Mr. Upton had replied, "You are entirely correct that the stock transfer is not impressed with any trust or actual obligation in my favor."

It is, however, clear from the evidence that Mr. Upton intended, or expected, when he made the transfers, that the income, or some of it at least, would be available for his use after the transfer, and he asked his attorney if there would be any legal objection if Mrs. Upton gave him part of her income to pay certain expenses, such as yacht, or household, expenses, and in reply he was advised that "whatever Mrs. Upton may wish to do in regard to her income, whether in paying household expenses or otherwise, does not affect the situation." In my opinion this was sound advice, and obviously the decedent acted upon it, with the result that the money was checked out as stated in the foregoing summary of facts. This was done under powers of attorney, revocable at any time by Mrs. Upton, powers which gave the husband no vested right or interest in the income, and no power or control over the funds, except as an attorney for Mrs. Upton, who, I think it must be conceded, had a right to do with the income as she pleased. Tileston v. Tileston, supra; Illinois Merchants Trust Co. v. Commissioner, 12 B. T. A. 818.

Even if the donor had never intended that the gift would deprive him of all benefits, the gift would not be thereby defeated. Pollock v. Pollock, 223 Mass. 382, 384, 111 N. E. 963; Edgerly v. Edgerly, supra; Ratterman v. Lodge (C. C. A.) 13 F.(2d) 805; De Laurent v. Townsend, 214 App. Div. 493, 212 N. Y. S. 377.

I am of the opinion that, on the facts shown, the conclusion must follow that the decedent did part with dominion and control over the shares represented by the transferred certificates, which, coupled with the delivery and the donative intent, furnished adequate grounds for declaring the gift to be a valid and completed gift.

The case of Tileston v. Tileston, supra, is very much in point. That was a case where the husband transferred to his wife shares of stock, taking new shares in her name, re-

taining possession of the certificates, and a right to use whatever income was derived from the shares. After marital difficulties arose, the husband undertook to recover the shares, and even went so far as to testify that he never intended to make a gift. The court, however, held that the master was warranted in finding that a gift was intend-- ed, and the husband did not prevail in his suit.

The defendant has cited many cases in support of his several contentions to which I have given careful consideration. Many of them deal with property other than shares of stock in corporations, or with relationships other than that of husband and wife, or are otherwise distinguishable upon the facts. Especially is this true of the case of Allen-West Commission Co. v. Grumbles (C. C. A.) 129 F. 287, much relied upon by the defendant. In that case the court was dealing with the rights of a wife under a written assignment of shares which had not been transferred on the books of the corporation, and which had not left the possession of the husband.

So far as the cases cited are inconsistent with the conclusions stated in this opinion, they are apparently out of harmony with the principles which have been promulgated by the courts of this commonwealth, and it is to the laws of Massachusetts that we must look in order to determine whether the shares in question were to be administered as a part of the estate of Mr. Upton.

The facts established by the evidence, as they tend to indicate the history of the transaction, the donor's motives and purposes, the relationship of the parties and their conduct, all conspire to negative the suggestion of the Circuit Court of Appeals that the evidence might warrant a finding of fact that the whole procedure was a mere sham or subterfuge. I find as a fact that it was not.

It was brought out at this trial for the first time that the power of attorney to indorse certificates of stock was no part of the original plan of the decedent, that it was suggested and drawn by his attorney, who advised that such a power might be necessary in order to consummate an exchange of securities held by the bank as collateral.

With reference to the 3,300 shares received by Mrs. Upton as a stock dividend, which, at the time of his death, stood in the name of the decedent, the probate court, having jurisdiction over the administration of the estate, has adjudged these shares to be the property of Mrs. Upton and not any part of the testator's estate. I do not understand that the defendant has seriously contended that these shares should be treated in any way different from the shares that stood in the name of Mrs. Upton. If it were necessary to the decision, I would be strongly inclined to the opinion that the federal taxing authorities would be concluded by the decree of the probate court whose jurisdiction over the parties and the subject-matter cannot be questioned. See McCaughn v. Girard Trust Co. (C. C. A.) 19 F.(2d) 218; Ford v. Nauts (D. C.) 25 F.(2d) 1015. But the undisputed evidence before me is to the effect that there was no gift of these shares by Mrs. Upton to her husband. The essential element of donative intent was wholly lacking. Without undertaking to decide whether this court is bound by the decree of the state court, I have no hesitation in adopting it as consistent with the law governing the case.

In conclusion, I find and rule that the shares in controversy did not constitute a part of the decedent's estate at the time of his death, and that the plaintiffs are entitled to recover judgment in the sum of $33,532.80, with interest.

The plaintiffs have filed numerous requests for rulings, all of which, with the exception of Nos. 18, 19, 21, 22, and 26, are consistent with the foregoing and are allowed. The remaining exceptions do not now appear to be material, and I make no ruling on them.

Of defendant's requests for rulings, I grant the first, second, and third. All other requests are denied.