997 F.2d 857
 129 A.L.R.Fed. 785
 Tyrone BROOKS, et al., Plaintiffs-Appellees, Cross-Appellants,
v.
GEORGIA STATE BOARD OF ELECTIONS and Max Cleland, Secretary
of State and Chairman of the Georgia State Board
of Elections, Defendants-Appellants,
Cross-Appellees.
 No. 92-8152.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 10, 1993.
 
 Walbert & Herman, Carol Atha Cosgrove, Atlanta, GA, for defendants-appellants.
 Laughlin McDonald, ACLU, Mary Wyckoff, Kathleen L. Wilde, Neil Bradley, Atlanta, GA, for plaintiffs-appellees.
 Appeals from the United States District Court for the Southern District of Georgia.
 Before EDMONDSON and CARNES, Circuit Judges, and HILL, Senior Circuit Judge.
 CARNES, Circuit Judge:
 
 
 1
 This appeal and cross-appeal involve issues arising from the award of attorney's fees in connection with litigation involving Section 5 of the Voting Rights Act before a three-judge panel of the district court. The Georgia State Board of Elections and a state official, who were defendants in the litigation, appeal from the award of attorney's fees. They contend that the district court erred by including in compensable hours the time plaintiffs' counsel spent in connection with the Department of Justice's preclearance process, by including the time spent on unadjudicated Section 2 claims, and by failing to reduce the award on grounds of limited success. The plaintiffs cross-appeal contending that the district court used too low an hourly rate to calculate the award.
 
 I. BACKGROUND
 
 2
 Under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, before a covered jurisdiction may enforce "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force on November 1, 1964," the jurisdiction must either obtain a judgment from the United States District Court for the District of Columbia declaring that the new voting practice has neither the purpose nor effect of discrimination, 42 U.S.C. § 1973c; Barnett v. Bailey, 956 F.2d 1036, 1040 (11th Cir.1992), or it must obtain review and "preclearance" of the proposed change from the Department of Justice. City of Lockhart v. United States, 460 U.S. 125, 128-29, 103 S.Ct. 998, 1001, 74 L.Ed.2d 863 (1983); Barnett, 956 F.2d at 1040. Georgia is a covered jurisdiction for purposes of Section 5. See 28 C.F.R. § 51.4; id. pt. 51, Appendix.
 
 
 3
 In June of 1988, the State of Georgia submitted to the United States Attorney General for preclearance eighty statutes enacted between 1964 and 1988 which created a total of seventy-seven superior court judgeships and five judicial circuits. While that submission was pending before the Attorney General, on July 13, 1988, Tyrone Brooks and other black registered voters in Georgia ("Brooks") brought a class action challenging Georgia's method of electing judges to its superior courts, which are the courts of general jurisdiction in Georgia.[1] Brooks challenged Georgia's redistricting of judicial circuits to create new circuits and its creation of new superior court judgeships within existing circuits. Brooks claimed that those actions had not been precleared under Section 5. Brooks' complaint also claimed that Georgia's method of electing superior court judges violated Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the United States Constitution. Pursuant to 42 U.S.C. § 1973c and 28 U.S.C. § 2284, a three-judge district court panel was convened to consider Brooks' Section 5 claims. See Allen v. State Bd. of Elections, 393 U.S. 544, 561-63, 89 S.Ct. 817, 829-30, 22 L.Ed.2d 1 (1969) (Section 5 coverage disputes to be heard by a three-judge panel of the district court).
 
 
 4
 In August of 1988, the United States Attorney General precleared twenty-nine of the seventy-seven judgeships and three of the five judicial circuits, but he requested additional information with respect to the remaining forty-eight judgeships and two judicial circuits. The State supplied some of the information, but declined to comply fully with the Attorney General's request. Thereafter, on June 16, 1989, the Attorney General interposed an objection to those remaining unprecleared forty-eight judgeships and two judicial circuits.
 
 
 5
 The district court heard and decided only Brooks' Section 5 claim. The principal dispute before the court involved the application of Section 5 to judicial elections. Although Georgia had submitted changes in its judicial elections for preclearance before Brooks filed his lawsuit, the State maintained that it had done so only out of an abundance of caution and contended that the election of judges was not covered by Section 5's provisions.
 
 
 6
 On December 1, 1989, the district court ruled in favor of Brooks on his Section 5 claims and ordered the State, within thirty days, to request reconsideration by the United States Attorney General of the new judgeships and of the redistricted judicial circuits to which he had objected, and it also ordered the State to comply with the Attorney General's previous request for additional information with respect to the unprecleared changes. The court further ordered as a remedy that if the State failed to comply with its directions or failed to obtain preclearance, certain of the unprecleared judgeships could not be filled and others would be vacated at specified times. Brooks v. State Bd. of Elections, 775 F.Supp. 1470, 1482, 1483-84 (S.D.Ga.1989) (Brooks I ), corrected, 790 F.Supp. 1156 (S.D.Ga.1990), modified on reconsideration, 775 F.Supp. 1490, 1491 (S.D.Ga.1991) (Brooks II ). The district court thereby conditioned the continuing operation of the challenged changes and, thus, Brooks' ultimate remedy as a prevailing plaintiff, on the results of the State's preclearance efforts.
 
 
 7
 Appeals from three-judge district court panels lie directly with the United States Supreme Court, 42 U.S.C. § 1973c; Allen v. State Bd. of Elections, 393 U.S. at 561-63, 89 S.Ct. at 829-30. Both parties did appeal--the State contending that judicial elections were not covered by Section 5, and Brooks contending that the district court panel should have granted additional affirmative relief. The Supreme Court summarily affirmed the judgment in all respects. Brooks v. Georgia State Bd. of Elections, 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990) (mem.).
 
 
 8
 On January 2, 1990, in compliance with the district court panel's order, the State of Georgia requested reconsideration by the United States Attorney General of his June 16, 1989 objection to the forty-eight judgeships and two judicial circuits. The State also submitted for preclearance ten additional judgeships created by statute in 1989 and 1990. On April 25, 1990, the Attorney General declined to withdraw his June 16, 1989 objection to the forty-eight judgeships, and he entered an objection to the additional ten judgeships created in 1989 and 1990. The Attorney General did, however, withdraw his prior objection to the two judicial circuits.
 
 
 9
 Thereafter, Brooks filed for costs and attorney's fees under 42 U.S.C. §§ 1973l (e) and 1988 based on the district court's entry of judgment in his favor on his Section 5 claims. The State conceded that Brooks was entitled to fees as a prevailing party, but it disputed the amounts claimed. The district court awarded Brooks $138,256.97 in attorney's fees and costs. The State appeals contending that the court awarded too much; Brooks cross-appeals contending it awarded too little.
 
 
 10
 Brooks' fee petition included a request for time spent by Brooks' counsel on matters relating to the State's preclearance submissions to the Justice Department. The district court included compensation for this work in its fee award, holding:
 
 
 11
 [I]t is clear that the preclearance work in this case was both useful and ordinarily necessary to the litigation.
 
 
 12
 The work was "ordinarily necessary" to the federal litigation because the Court conditioned its decision on the preclearance outcome. Once the Court created this connection between the preclearance and the outcome of the litigation, it made the plaintiff's work on preclearance "ordinarily necessary." Moreover, the work was useful to the litigation because many of the same issues were argued for preclearance and for the federal suit, and the plaintiffs' success with the Department of Justice led to an injunction in this court to enforce that decision.
 
 
 13
 Order entered December 30, 1991, at 10. The State challenges this conclusion and contends that the district court improperly awarded fees to Brooks for work done in connection with the Justice Department's consideration of the State's submissions for Section 5 preclearance. The State also challenges the award of fees for work done on issues allegedly related only to Brooks' Section 2 claims, which were not ruled upon by the district court. In addition, the State contends that the court should have reduced the fee award because of Brooks' limited success. In his cross-appeal, Brooks contends that the district court erred in determining that the prevailing market rate for comparable work in Atlanta was $125-$175 per hour, and that the court's decision to award fees to Brooks at $125 per hour, the lowest figure in that range, was also erroneous.
 
 II. DISCUSSION
 
 14
 A. Award of Fees for Work Opposing Preclearance by the Department of Justice
 
 
 15
 42 U.S.C. §§ 1973l (e) and 1988 provide that a "prevailing party" may recover attorney's fees and costs in an "action or proceeding" to enforce civil rights statutes, including the voting rights statutes, and the voting guarantees of the Fourteenth and Fifteenth Amendments. We will not distinguish between these two statutory fee provisions in considering the issues before us, because the standards for awarding fees under the two provisions are generally the same, e.g., Maloney v. City of Marietta, 822 F.2d 1023, 1025 n. 2 (11th Cir.1987), and the parties have assumed that both are applicable.[2]
 
 
 16
 "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (emphasis added); see Norman v. Housing Auth. of City of Montgomery, 836 F.2d 1292, 1299 (11th Cir.1988). Thus, compensable time for purposes of these fee statutes is that time spent "on the litigation."
 
 
 17
 The State challenges the inclusion in the district court's fee award of some 283.50 hours of time[3] spent in what the State characterizes as voluntary "lobbying" of the Justice Department against preclearance. Brooks prefers to characterize the time in question as spent actively participating in the preclearance process, rather than lobbying. Whatever the nomenclature, the time at issue was spent on work preparing and presenting evidence and arguments to the United States Attorney General in opposition to the State's preclearance request. Some, but not all, of that work was done in response to specific requests from the Attorney General. All of the time in question was spent after Brooks filed his lawsuit, and virtually all of it was spent after the district court's December 1, 1989 order enjoining the State from taking certain action relating to the judgeships absent preclearance. The district court held that all of the time Brooks' attorneys spent opposing the State's preclearance efforts was compensable.
 
 
 18
 The issue of whether, and under what circumstances, a voting rights plaintiff may receive attorney's fees for opposition to Section 5 preclearance efforts is one of first impression in this Circuit. We have no controlling decisions on point, but we do have guidance from some relevant Supreme Court attorney's fees decisions. Although none of them involved Section 5 preclearance work, we can draw sufficient bearings from their holdings and reasoning to find our way to disposition of the preclearance issue in the present case.
 
 
 19
 In New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980), the Court held that work a Title VII plaintiff had performed pursuing a state administrative remedy was compensable under the attorney's fees statute. That holding was limited in Webb v. Board of Educ. of Dyer County, Tennessee, 471 U.S. 234, 240, 105 S.Ct. 1923, 1927, 85 L.Ed.2d 233 (1985), to situations, such as Title VII, where the federal statute required exhaustion of state administrative remedies before resort to the federal remedy. The Webb decision itself involved work a plaintiff's counsel had done in a state school board administrative proceeding unsuccessfully attempting to obtain reinstatement before he filed a successful 42 U.S.C. § 1983 lawsuit. Section 1983 does not have an exhaustion requirement, and the Supreme Court upheld the district court's denial of fees for what it characterized as "time spent pursuing optional administrative proceedings." Id. at 236, 105 S.Ct. at 1925. The Court pointed to its statement in Hensley that a prevailing plaintiff was entitled to fees for time "reasonably expended on the litigation." Webb, 471 U.S. at 242, 105 S.Ct. at 1928 (quoting Hensley, 461 U.S. at 433, 103 S.Ct. at 1939 (emphasis added)). Section 1988 provides that a fee is to be allowed "as part of the costs" of a civil rights action. Id. The Court reasoned that "it is difficult to treat time spent years before the complaint was filed as having been 'expended on the litigation' or to be fairly comprehended as 'part of the costs' of the civil rights action." Id.
 
 
 20
 The Webb Court did not close the door entirely on attorney's fees for extra-judicial work. In words that presaged its next decision in this area, the Court noted that the plaintiff in that case had not argued that any discrete portion of the work product from the administrative proceedings was work that was "both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached before settlement." Id., 471 U.S. at 243, 105 S.Ct. at 1928-29. Instead, he had argued that all of the work should be treated alike, and the district court had held that all of it was not compensable. Id. The Supreme Court stressed that review of such matters was limited to determining whether there had been an abuse of discretion:
 
 
 21
 "We reemphasize that the district court has discretion in determining the amount of a fee award." [Hensley, 461 U.S.] at 437, 103 S.Ct., at 1941. When such an award is appealed, the reviewing court must evaluate its reasonableness with appropriate deference. Considering the governing legal principles, the petitioner's burden of establishing his entitlement to the requested fee, and the evidence and arguments presented below, we conclude that the District Court's decision to deny any fees for time spent pursuing optional administrative remedies was well within the range of reasonable discretion.
 
 
 22
 Id. at 244, 105 S.Ct. at 1929 (footnote omitted).
 
 
 23
 The year after Webb, a Supreme Court decision illustrated what was meant by extra-judicial work that was compensable because it was both "useful and of a type ordinarily necessary to advance the civil rights litigation." Pennsylvania v. Delaware Valley Citizens Council for Clean Air, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) involved the Clean Air Act, which authorized an award of the "costs of litigation (including reasonable attorney ... fees)." Id. at 557, 106 S.Ct. at 3094 (quoting 42 U.S.C. § 7604(d)). The holding and reasoning of the Delaware Valley case are fully applicable to cases involving the civil rights attorney's fees statutes, because the Supreme Court expressly stated that the Clean Air Act fees provision and 42 U.S.C. § 1988 should be interpreted alike. Id. at 560, 106 S.Ct. at 3095-96.[4] Therefore, we analyze that case and apply what we learn from it the same as if it involved civil rights litigation and the attorney's fees statutes at issue in this case.
 
 
 24
 Delaware Valley stemmed from one of those consent decrees that is easier to obtain than enforce. The Pennsylvania Department of Transportation ("PennDOT") was required by the consent decree to institute by legislation or regulation a state-wide franchise system for a vehicle emissions inspection and maintenance program (I/M program). Delaware Valley, 478 U.S. at 549, 106 S.Ct. at 3090. As the Supreme Court observed, "[e]ntry of the consent decree marked only the beginning of this story, for implementation of the I/M program did not proceed smoothly." Id. The post-consent decree history of the litigation involved nine phases, and the attorney's fees dispute arose out of Phases II and IX. The question before the Supreme Court was whether the district court erred in awarding Delaware Valley, the plaintiffs, attorney's fees for the post-judgment work in those two phases. The Phase II work was described as follows:
 
 
 25
 After PennDOT published the proposed I/M program regulations, Delaware Valley continued to monitor the Commonwealth's performance under the consent decree, and submitted comments on the regulations which were published in the Pennsylvania Bulletin.
 
 
 26
 Id. at 550, 106 S.Ct. at 3090. The Phase IX work was described as follows:
 
 
 27
 This phase includes work done by Delaware Valley in hearings before the Environmental Protection Agency, during which, inter alia, the Commonwealth unsuccessfully sought that agency's approval of an I/M program covering a smaller geographic area.
 
 
 28
 Id. at 552-53, 106 S.Ct. at 3092. In a footnote to that description, the Court noted that Phase IX also included work that Delaware Valley had done in related state court litigation. The signing of the consent decree had touched off an intra-governmental dispute in Pennsylvania, and a group of state legislators brought a lawsuit in state court challenging the Executive Branch's authority to implement an I/M program. Delaware Valley had filed an amicus brief on behalf of the Executive Branch, which ultimately lost the state court litigation. Id. at 553 n. 1, 106 S.Ct. at 3092 n. 1.
 
 
 29
 In the attorney's fees dispute, the Commonwealth of Pennsylvania objected to compensation for any of Delaware Valley's Phase II or Phase IX work because it was done in "only tangentially related state and federal administrative proceedings." Id. at 554, 106 S.Ct. at 3093. The district court rejected Pennsylvania's arguments and awarded full compensation for that work. The court of appeals affirmed, citing Webb, and reasoning that the Phase II and Phase IX work "was useful and necessary for securing full enforcement of the decree." Id. at 556, 106 S.Ct. at 3094.
 
 
 30
 The Supreme Court affirmed the award of fees. It rejected the Commonwealth's textual argument that the statutory language authorizing fees as "costs of litigation" for "action[s] brought" under the Act limited compensable work to that expended in judicial actions. Id. at 557-58, 106 S.Ct. at 3094. While acknowledging that the Phase II and Phase IX proceedings were not judicial proceedings, the Court explained that "the work done by counsel in these two phases was as necessary to the attainment of adequate relief for their client as was all of their earlier work in the courtroom which secured Delaware Valley's initial success in obtaining the consent decree." Id. at 558, 106 S.Ct. at 3094. Thus, the Supreme Court employed a pragmatic test over a technical one in construing the attorney's fees statute.
 
 
 31
 The Supreme Court also found support for its conclusion in decisions of a number of courts of appeal, including Miller v. Carson, 628 F.2d 346, 348 (5th Cir.1980), a decision binding on us, which held that post-judgment consent decree monitoring is compensable under 42 U.S.C. § 1988. The Supreme Court said that the fact that § 1988 authorizes fees only in "any action or proceeding" to enforce civil rights, and that the Clean Air Act applies only to "an action" does not mean Congress did not intend the Act to apply to administrative proceedings as well as judicial ones. Delaware Valley, 478 U.S. at 559, 106 S.Ct. at 3095. Given the common purposes behind the attorney's fees provision of the Clean Air Act and § 1988, the two are to be interpreted together; the consent decree monitoring precedents in § 1988 cases were used to support the Court's construction of the similar Clean Air Act provision. Id. at 559-60, 106 S.Ct. at 3095-96.
 
 
 32
 In Delaware Valley, the Supreme Court also reiterated and solidified into a holding its "useful and of a type ordinarily necessary" language from Webb, and noted that application of that standard was left to the discretion of the district court. The district court had found that Delaware Valley had a unique interest in the proposed regulations that were being considered in the administrative proceedings and that the usefulness of its comments was manifest. It also found that the administrative proceeding work had helped to protect the relief that had been awarded under the consent decree. Id. at 560-61, 106 S.Ct. at 3096. In the concluding paragraph of its discussion, the Supreme Court said:
 
 
 33
 We agree that participation in these administrative proceedings was crucial to the vindication of Delaware Valley's rights under the consent decree and find that compensation for these activities was entirely proper and well within the "zone of discretion" afforded the District Court.
 
 
 34
 Id. at 561, 106 S.Ct. at 3096 (quoting Hensley, 461 U.S. at 442, 103 S.Ct. at 1944 (Brennan, J., concurring in part and dissenting in part)). The Court affirmed the award of fees for work done in Phases II and IX. The liberality of the Court's view of what was "crucial to the vindication of Delaware Valley's rights under the consent decree" is illustrated by the fact that the Phase IX work that was fully compensated included the filing of an amicus brief in an unsuccessful effort to influence a state appellate court proceeding. Id. at 553 n. 1, 106 S.Ct. at 3092 n. 1. Read against those facts, Delaware Valley 's requirement that the work be "crucial" to the vindication of rights under the judgment appears to mean not much more than that it be relevant to those rights and related to terms of the judgment.
 
 
 35
 The post-judgment preclearance work Brooks' attorneys did in this case certainly appears to be as crucial to the vindication of Brooks' rights under the judgment in this case as the unsuccessful state court amicus work was to vindication of the plaintiffs' rights in Delaware Valley. Before we decide whether to affirm on that basis, we consider arguments that the State of Georgia has made, arguments that deserve an answer. Those arguments must be measured against the language, rationale, and holding of the Delaware Valley decision, which we are bound to follow faithfully. The State places much reliance upon the Supreme Court's holding of Webb v. Board of Educ. of Dyer County, but as we have explained, one year later in Delaware Valley the Webb decision was amplified in a manner unfavorable to the State's position in this case. The "useful and ordinarily necessary" standard of Webb must be read in light of the facts and holding in Delaware Valley.
 
 
 36
 The State argues that the text and legislative history of the attorney's fees statutes indicate that Section 5 preclearance review work is not compensable. The major premise of that argument is that the language and legislative history of the statutes limit compensable hours to those spent in litigation in a judicial proceeding. The State relies heavily on Posada v. Lamb County, Texas, 716 F.2d 1066, 1073-74 (5th Cir.1983), Gerena-Valentin v. Koch, 739 F.2d 755, 759-61 (2d Cir.1984), and Arriola v. Harville, 781 F.2d 506, 509-10 (5th Cir.), cert. denied, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 38 (1986). Unfortunately for the State, in Delaware Valley the Supreme Court clearly stated that there is insufficient indication in the text or otherwise to conclude that Congress intended § 1988 to apply only to judicial, and not administrative, proceedings. 478 U.S. at 559-60, 106 S.Ct. at 3095-96. Indeed, the result of Delaware Valley, compensation for hours spent commenting on regulations and appearing in regulatory hearings after the judgment was obtained, forecloses the major premise of the State's argument, which is that time is not compensable unless it is spent in traditional judicial proceedings. As we explained earlier, Delaware Valley is a Clean Air Act case, but the Supreme Court said in that case: "Given the common purpose of [the attorney fees provision of that Act] and § 1988 to promote citizen enforcement of important federal policies, we find no reason not to interpret both provisions governing attorney's fees in the same manner." Id. at 560, 106 S.Ct. at 3096.
 
 
 37
 The State of Georgia also argues that no attorney's fees should be awarded for Section 5 preclearance work, even when it is connected to the litigation, unless the plaintiff can prove a causal connection between the work performed and the ultimate refusal of the United States Attorney General to preclear the changes in question. The record in this case demonstrates that Brooks' counsel participated extensively in the preclearance process, preparing and presenting evidence and arguments in opposition to preclearance, and that some of those presentations were specifically requested by the Attorney General. Given the nature of the preclearance process and the nature of the human mind, however, whether the Attorney General would have reached the same decision without the input of Brooks' attorneys is unknown, and probably unknowable. To require plaintiffs to prove a causal connection between their input and the preclearance result would foreclose compensation in all but the most unusual circumstances. That prospect alone does not end the inquiry, but other considerations lead us to conclude that a causation requirement, a "but for" limitation, is inappropriate.
 
 
 38
 The Fifth Circuit did adopt such a requirement in its 1983 Posada decision, holding that if fees can be recovered for preclearance opposition work at all, it is only where there is a showing that the participation "through particularly astute criticism or creative legal argument, changed the result that the Attorney General would otherwise have reached." 716 F.2d at 1075. Three years later, in Arriola v. Harville the Fifth Circuit abandoned the requirement that a causal connection exist between the work performed and the preclearance results. See Leroy v. Houston, 831 F.2d 576, 580 (5th Cir.1987) (stating that Posada was superseded in this respect by Arriola), cert. denied, 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988). A principal reason the causation standard was abandoned was the understandable opposition of the Department of Justice to probing inquiries into its decision-making process. Arriola, 781 F.2d at 510; Leroy, 831 F.2d at 580.
 
 
 39
 We would be hesitant to adopt a rule abandoned by the circuit that created it. Our reluctance is enhanced by knowledge that the responsibilities of the Department of Justice in Section 5 preclearance matters are heavy enough without the burden of searching judicial inquiry after the fact into its decisional process in a given matter. See Leroy, 831 F.2d at 580 ("The Justice Department rightly complains that it is inconsistent with the spirit and purpose of administrative preclearance under Section 5 of the Voting Rights Act to permit judicial inquiry into its functions."). We also recall the Supreme Court's admonition that a "request for attorney's fees should not result in a second major litigation." Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Moreover, although the Delaware Valley case did not squarely address the issue, the result in that case may indicate that no causation requirement exists. None was articulated in that case. There was no showing that without Delaware Valley's input the Pennsylvania regulations would have been different in Phase II, Delaware Valley, 478 U.S. at 550, 106 S.Ct. at 3090; nor was there a showing that the EPA would have acted differently in Phase IX but for Delaware Valley's work, id. at 552-53, 106 S.Ct. at 3092. There certainly could not have been a causal connection shown between Delaware Valley's submission of the amicus brief in the state appellate court proceedings and the result, because the state supreme court rejected the position Delaware Valley supported. Id. at 553 n. 1, 106 S.Ct. at 3092 n. 1. That the Supreme Court nonetheless upheld the award of attorney's fees for all of that work seems to us some indication that there is no causal connection, no "but for" showing, that must be made before a plaintiff is awarded fees for extra-judicial work that is otherwise " 'useful and of a type ordinarily necessary' to secure the final result obtained from the litigation." Id. at 561, 106 S.Ct. at 3096. For all of the reasons we have discussed, we conclude that there is no requirement that a causal connection exist between the work performed in opposition to preclearance and the denial of preclearance.
 
 
 40
 The State of Georgia relies upon three cases from the Fifth Circuit and one Second Circuit case, all of which denied attorney's fees for Section 5 preclearance work. The Second Circuit decision, Gerena-Valentin, and two of the Fifth Circuit decisions, Posada and Arriola, preceded Delaware Valley and were, thus, uninformed by that decision. In addition, in Gerena-Valentin the Second Circuit addressed only the issue of whether fees were available for preclearance work in connection with a superfluous lawsuit. The court expressly reserved the question of whether such work could be compensated if it was in direct aid of litigation which independently supports an award of fees. 739 F.2d at 759.
 
 
 41
 The Fifth Circuit decision in Leroy v. City of Houston cannot be explained away on the basis of timing, because it was issued a year after the Delaware Valley decision. In Leroy, the court held that its own decision in Arriola and the Supreme Court's decision in Webb prohibited awarding attorney's fees for the work of plaintiffs' attorneys in opposing preclearance. 831 F.2d at 582-83. The facts in Leroy distinguish it from this case. Although the United States Attorney General did initially object to parts of the second submitted changes in Leroy, he withdrew those objections and precleared the changes a few months later. Id. at 578-79. In this case, by contrast, the plaintiffs prevailed in their opposition to the Section 5 preclearance submission as well as in the underlying litigation. The language and reasoning of the two judges who joined the Leroy opinion[5] does sweep broader than that distinction, and if we fully subscribed to their opinion we might well be required to decide this issue differently than we do. While we have affection for the circuit from which our court came and respect for the judges of that court, we are not bound by Fifth Circuit decisions rendered since our separation, a category of cases which includes Arriola and Leroy. We note that even though the Leroy decision came after Delaware Valley, the part of it that is relevant to this discussion does not even mention that Supreme Court decision.
 
 
 42
 The State of Georgia's brief offers only one argument for distinguishing Delaware Valley. The State argues that because the United States Attorney General in this case did not revise a previously held position after Brooks' efforts, "there is no manifestation of the usefulness, much less the necessity of Plaintiffs' comments, distinguishing this case from Pennsylvania v. Delaware Valley Citizens Council." That attempted distinction cannot withstand scrutiny, because there was no greater "manifestation of the usefulness, much less the necessity" of the administrative agency work for which the Delaware Valley plaintiffs were compensated. That work did not result in any revision of the administrative agency's position. The Phase IX work done in that case was in opposition to the Commonwealth's request for administrative agency approval of action that would have impaired the plaintiffs' rights under the judicial decree; much the same is true in this case.
 
 
 43
 In awarding attorney's fees for Brooks' preclearance opposition work, the district court relied upon the fact that the court had "conditioned its decision on the preclearance outcome." Order entered December 30, 1991, at 10. The court reasoned that, "[o]nce the Court created this connection between the preclearance and the outcome of the litigation, it made the plaintiff's work on preclearance 'ordinarily necessary,' " as well as "useful." Id. The Supreme Court has admonished us that district courts have wide discretion in such matters, and that we must evaluate the reasonableness of fee awards with appropriate deference. Webb, 471 U.S. at 244, 105 S.Ct. at 1929. We find that the district court panel's action in awarding fees for preclearance work performed after the court's decision had conditioned the ultimate outcome of litigation on the preclearance result was "within the 'zone of discretion' afforded the District Court." Delaware Valley, 478 U.S. at 561, 106 S.Ct. at 3096. Given the breadth of a district court's discretion in this area and the closeness of the question, we do not mean to imply that it would have been an abuse of discretion for the district court panel to have denied an award of fees for the preclearance work. That issue is not presented.
 
 
 44
 We do affirm the award of fees for the time Brooks spent opposing preclearance after issuance of the district court panel's December 1, 1989 order conditioning the outcome of the challenged changes on preclearance. Brooks' attorney acknowledged in oral argument, however, that a small number of preclearance opposition hours for which fees were awarded had been spent before the district court panel's December 1, 1989 order was issued. As she conceded, Brooks' argument for compensation for those earlier hours is much weaker than for the hours spent after the district court entered its decision. Those few pre-decision hours should not have been compensated under the district court's own rationale. It is an abuse of discretion for a district court to misapply the standard it has adopted. See Gilmere v. City of Atlanta, 931 F.2d 811, 814 (11th Cir.1991) (district court has great latitude in formulating attorney's fees awards, but must explain its reasoning so that it can be reviewed). Accordingly, we will remand this case to the district court panel in order that it may recalculate the number of hours Brooks spent in preclearance work after the court's December 1, 1989 decision and limit its award for preclearance work to those hours alone.[6]
 
 
 45
 B. Award of Fees for Work Related to Showing Discrimination or the Potential for Discrimination
 
 
 46
 The State of Georgia also contends that the district court panel erred by including in its fee award compensation for time spent by Brooks' counsel on matters related solely to a showing of actual discrimination, or the potential for discrimination, in the challenged changes in the laws relating to judgeships and judicial circuits. The State contends that this work was connected to the Section 2 claim, which was never adjudicated, and was unrelated to the Section 5 dispute the district court panel decided. Brooks contends, and the court held, that this work was related to the Section 5 litigation, at least closely enough to be compensable. We review that conclusion for an abuse of discretion, accepting any factfindings of the court unless they are clearly erroneous.
 
 
 47
 A three-judge court hearing a claim under Section 5 of the Voting Rights Act does not rule on the discriminatory purpose or effect of the changes at issue. Its inquiry is limited to: "(i) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy [is] appropriate." City of Lockhart v. United States, 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 1001 n. 3, 74 L.Ed.2d 863 (1983). While recognizing that, the district court panel in this case found that in establishing Section 5 coverage Brooks had been required to prove that the challenged changes had the potential for discrimination, and that the work in question was compensable for that reason. See, e.g., Dougherty County Bd. of Education v. White, 439 U.S. 32, 42, 99 S.Ct. 368, 374, 58 L.Ed.2d 269 (1978) ("[I]n determining if an enactment triggers § 5 scrutiny, the question is not whether the provision is in fact innocuous and likely to be approved, but whether it has a potential for discrimination.") (emphasis in original).
 
 
 48
 In its decision on the merits, the district court panel had specifically found that the challenged changes had the potential for discrimination. Brooks I, 775 F.Supp. at 1479-80. The State argues that the district court panel had not relied on this work of Brooks' counsel in concluding that the challenged changes had the potential for discrimination. In awarding Brooks attorney's fees for this work, however, the court found, at least implicitly, that this work had been considered by it and was useful in arriving at its potential discrimination holding. We do not know if the human mind can imagine a situation in which we would conclude that a court had clearly erred in a finding about what that court itself had considered in reaching a decision; but we know that this is not such a situation. The State also argues that the amount of work compensated exceeded that which was required to prove a potential for discrimination. The reasonableness of the hours expended is a question committed to the sound discretion of the district court panel, and we do not conclude that that discretion was abused under the circumstances of this case.
 
 
 49
 The second basis the district court panel found for awarding fees for this work is that it was related to the remedy. The court reasoned that a court may consider equitable arguments in arriving at an appropriate remedy for a Section 5 violation and work of the kind in question here may be relevant to the question of what relief should be granted. The State argues that the court's remedy was based upon a reading of the law, and that the work in question was not considered. Again, we trust the very court which adjudicated the Section 5 claim and shaped the remedy to know what it considered relevant.
 
 
 50
 The State also contends that the work Brooks did to establish discrimination or the potential for discrimination should not be compensable, because it was in reality done as part of Brooks' opposition to preclearance by the Department of Justice, and preclearance opposition work should not be compensated. We have no occasion to examine the factual premise of the State's argument, because we have already rejected its legal premise. To the extent that the work was done in connection with the preclearance process, under our earlier holding that is an additional reason for holding it to be compensable.
 
 
 51
 Under all of the facts and circumstances of this unusual case, including the relatively small number of hours involved,[7] we cannot say that the district court's award of fees for the work in question was an abuse of its considerable discretion. Again, we have no occasion to decide whether the opposite result would have been an abuse of discretion.
 
 
 52
 C. Refusal to Reduce the Award for Limited Success
 
 
 53
 The State contends that the district court panel should have reduced the total amount of the award because Brooks' "degree of success in this case has been somewhat limited." The district court panel did not agree; nor do we. As a result of Brooks' efforts, the court held that the challenged changes were covered by Section 5 and ordered the State to seek preclearance, something the State had contended it was not required to do. The court fashioned a remedy that conditioned the continuing validity of the challenged judgeships and the continuation in office of certain judges on the State securing preclearance. We agree with the district court that Brooks achieved excellent results on the Section 5 claims at issue here.
 
 
 54
 The State's argument that the fee award should be reduced because the district court declined to void all unprecleared judgeships as requested by Brooks is without merit. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.... In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). This principle is no less applicable where the plaintiff did not receive all the relief requested. See id. at 435-36 n. 11, 103 S.Ct. at 1940-41 n. 11 (noting that plaintiff who obtains injunction but not damages may still recover fee award for all hours reasonably expended). The object of Brooks' Section 5 claim, the only claim litigated, was to block continued application of the challenged changes absent preclearance. Because this was, in fact, the ultimate result in this case, the district court's refusal to reduce Brooks' fee award for limited success was not an abuse of discretion.
 
 D. The Hourly Rate for Brooks' Counsel
 
 55
 Brooks' cross-appeal presents the issue of whether the district court panel erred in setting the hourly rate at which his counsel was compensated. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Norman v. Housing Auth. of the City of Montgomery, 836 F.2d 1292, 1299 (11th Cir.1988) (citing Blum v. Stenson, 465 U.S. 886, 895-96 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984)). In reviewing the district court's hourly rate determination, an appellate court must be mindful that, "[a]lthough an attorneys' fees award is reviewed for abuse of discretion, the determination of what constitutes a reasonable hourly rate is a finding of fact subsidiary to the total award and is therefore reviewed under the clearly erroneous standard." Turner v. Secretary of the Air Force, 944 F.2d 804, 808 (11th Cir.1991).
 
 
 56
 Brooks sought an award of fees at the rate of $175 per hour for attorney Laughlin McDonald and $150 per hour for attorney Kathleen Wilde. The district court awarded Brooks fees based on an hourly rate of $125 for both attorneys. Before the district court panel, Brooks had the burden of justifying his requested hourly rates, Blum, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11; Turner, 944 F.2d at 808, and in this Court he has the burden of establishing that the district court clearly erred in setting the hourly rate it did. In reaching its decision about the proper hourly rate, the district court panel first determined the relevant legal community, it then found the prevailing rate range for this type of work in that community, and it concluded the process by selecting an hourly rate within that range for Brooks' attorneys. We follow that same track in reviewing its determinations and conclude that that court made no error in two out of three of the steps it took. The third step is the problem.
 
 
 57
 In step one, the district court panel found that the relevant community was Atlanta, in which both McDonald and Wilde have their offices. Although the State suggested that the relevant community was Brunswick, Georgia, where the suit was tried, the court accepted affidavit evidence that there were no Brunswick attorneys familiar with voting rights actions who could have handled this case. This determination was not clearly erroneous. See Johnson v. University College, 706 F.2d 1205, 1208 (11th Cir.) (finding that civil rights litigants need not select the nearest and cheapest attorneys), cert. denied, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983).
 
 
 58
 In step two, the court found that Brooks' evidence established that the range of prevailing rates in Atlanta for work of this kind was $125 to $175 per hour. Brooks argues on appeal that the lower end of the range should have been $145 rather than $125, but the declaration of attorney Wilde herself stated that in 1989 she had been awarded fees in three voting rights cases at the rate of $125. Brooks filed this suit on July 13, 1988, and the district court entered its order in favor of Brooks on the Section 5 claims on December 1, 1989. Brooks I, 775 F.Supp. 1470. Because the evidence showed that one of Brooks' own counsel had been awarded fees at $125 per hour in other voting rights cases during the same general time frame, it was not clear error to find that that figure was the lower end of the prevailing rate range. Brooks also contends that the high end of the range should have been $200 per hour. There was evidence offered that some Atlanta attorneys were, indeed, paid $200 per hour and more. McDonald's own highest fee award in a voting rights case, however, was $175 per hour in November of 1990. For that reason and because the weight of the evidence appeared to put the top of the range at $175 between 1988 and 1990, the district court's determination was not clearly erroneous. Cf. Turner, 944 F.2d at 809 (even though attorney normally charged $200 per hour, on the record $125 not clearly erroneous).
 
 
 59
 In the third and final step of its analysis, the district court panel set the hourly fee rate at $125 per hour for both Wilde and McDonald, even though McDonald had far more experience than Wilde. While the court stated that it made that decision based on all of the evidence before it, the only specific evidence mentioned by the court in its brief discussion of hourly rates was that presented by the State concerning the fee rate at which David Walbert, the private attorney hired by the State, was compensated for his work in this case. The court noted that Walbert was paid only $100 per hour for most of his work for the State in this case, until June 1, 1990, when his rate went up to $120. The court cited our prior decision in Johnson, 706 F.2d at 1208, for the proposition that in setting an attorney's fees hourly rate a district court has discretion to determine the relevance of evidence concerning fees paid to opposing counsel. In Johnson, this Court found no abuse of discretion in the district court's denial of the plaintiffs' discovery requests concerning the fees paid to defense counsel. Id. We noted that evidence of the number of hours spent by defense counsel or the hourly rate paid to defense counsel was of questionable relevance in setting the rate for plaintiffs' counsel. Id. ("With respect to the hourly rate, one side may employ far more experienced counsel.").
 
 
 60
 In light of the particular circumstances of this case, the hourly rate at which opposing counsel was paid is of little or no relevance. Opposing counsel represented a governmental entity. We have recognized in the past that private attorneys often charge lower rates to the government because of counterbalancing benefits such as repeat business, and "[w]here the facts show this, the fee charged by a government attorney is simply irrelevant to the establishment of a reasonable hourly rate for a plaintiff's civil rights lawyer." Norman, 836 F.2d at 1300. Here, the facts show that opposing counsel did charge his governmental client a significantly lower rate than other clients.
 
 
 61
 The undisputed evidence is that David Walbert, the same attorney who did most of the work for the State in this case at the rate of $100 per hour, submitted an affidavit in a 1986 proceeding, two years before this one began, that his rate to private clients was $140 per hour, which he swore was below average for attorneys of his skill and expertise. In that same affidavit, Walbert characterized Laughlin McDonald, Brooks' lead counsel in the present case, as "the best known and most respected voting rights attorney in the United States." There was no evidence offered in this case that Walbert's skill, expertise, and career had peaked in 1986 and had been on a sharp downward slide since that time, nor was there any evidence that Walbert had lowered his opinion of his own professional worth or his opinion of McDonald. Under these circumstances, it was clear error for the district court panel to rely so heavily on the rate paid to opposing counsel. We remand the case to it so that the hourly rate can be fixed free of this error.
 
 
 62
 In reconsidering on remand the hourly rate or rates at which to compensate Brooks' counsel, the court should bear in mind our prior direction that a district court "must explain its reasoning in determining a reasonable attorney's fee to give this court an adequate and informed basis for review." Gilmere v. City of Atlanta, 931 F.2d 811, 814 (11th Cir.1991). We have held that the court did not err in setting the range of prevailing rates in this case at $125-$175. In determining the actual rate or rates of compensation within that range for Wilde and McDonald, the court should consider the skill, experience, and reputation of each of the two lawyers, the nature and difficulty of the work performed, and other relevant factors. The court should also consider the hourly rates these two attorneys had been paid in similar litigation at or before the time of this lawsuit. As mentioned previously, Wilde was awarded fees in three other voting rights cases at the rate of $125 per hour. McDonald had been awarded $175 per hour in 1990, but that was the highest amount he had ever been awarded.
 
 
 63
 We do not mean that the district court panel must necessarily re-open the record on remand; the evidence on these issues appears adequately developed. Nor do we mean to diminish the district court's authority to utilize its discretion and its own expertise in considering these matters and awarding reasonable attorney's fees. See Norman, 836 F.2d at 1303 (noting that courts may use own knowledge and experience in determining reasonable fees). Indeed, we remand the matter rather than decide it ourselves precisely because it is the district court panel that has the discretion to exercise, not us.
 
 III. CONCLUSION
 
 64
 We REMAND this case to the district court panel for the limited purpose of correcting two aspects of its calculation of attorney's fees. First, the court is to exclude from the number of hours for which compensation is awarded any hours spent on or before December 1, 1989 in opposition to preclearance by the Department of Justice.[8] Second, the court is to reset, within the $125 to $175 range, the hourly rate for each of Brooks' counsel, without regard to the rate paid to counsel for the State of Georgia. After making those two corrections, the court should recalculate the attorney's fees award and enter an appropriate order.
 
 
 
 [1]
 The defendants in the lawsuit, and the appellants/cross-appellees in this Court, are the Georgia State Board of Elections and Max Cleland in his capacity as chairman of that board and as Secretary of State. We will use the term "Georgia" or "the State" to refer to the defendants/appellants/cross-appellees
 
 
 [2]
 Neither the parties nor the district court panel recognized or discussed the question of whether the award of attorney's fees and costs in a Section 5 proceeding is governed by § 1973l (e) or § 1988, or both. The assumption throughout this proceeding has been that both provisions apply. Under the circumstances, and because there is no difference in the result under the two provisions, we, too, will assume that both are applicable
 
 
 [3]
 The fee statutes provide for the reimbursement of reasonable costs incurred as well as the award of attorney's fees. Both are involved in this case. For convenience, we will use the words "time" and "attorney's fees" as including non-fee costs and reimbursement, too
 
 
 [4]
 As we have previously noted, § 1973l (e) is to be interpreted the same as § 1988. Maloney, 822 F.2d at 1025 n. 2
 
 
 [5]
 The Leroy case was decided by a quorum of two judges after the death of the third panel member. 831 F.2d at 578 n. *
 
 
 [6]
 The same is true of any non-fee costs that may have been awarded in connection with pre-December 1, 1989 preclearance opposition. See n. 3, above. Those, too, must be excluded
 
 
 [7]
 The State challenged 13.4% of the hours included in the district court's award on this basis
 
 
 [8]
 The same goes for costs associated with such work. See n. 3, above